**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

RICHARD T.,

      Plaintiff,

v.                                                            CIVIL ACTION NO. 2:22-cv-00495

MARTIN J. O'MALLEY,
Commissioner of Social Security,[1]

      Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Richard T. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. This matter was referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Pending before this Court are Claimant's *Brief – Social Security* (ECF No. 12), and the Commissioner's *Brief in Support of Defendant's*

---

[1] Commissioner O'Malley was substituted in place of Acting Commissioner Kilolo Kijakazi following O'Malley's appointment on December 20, 2023.

*Decision* (ECF No. 13). Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 12), **GRANT** the Commissioner's request to affirm his decision (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. *Information about Claimant and Procedural History of Claim*

Claimant was 50 years old at the time of his alleged disability onset date and 52 years old on the date of the decision by Administrative Law Judge ("ALJ") Nathan Brown. (Tr. 12.)[2] Claimant was noted to have a limited education. (Tr. 24.) His past work included a machine-operator role, and he had an extensive work history spanning nearly thirty years between 1988 and 2016. (Tr. 24, 321-322.) Claimant alleges that he became disabled on December 6, 2019, due to arthritis, diabetes, hypertension, and mental impairments. (Tr. 306-314, 329.)

On December 10, 2019, Claimant protectively filed both (1) a Title II application for a period of disability and DIB, as well as (2) a Title XVI application for SSI. (Tr. 12.) The Social Security Administration ("SSA") denied his claims initially on June 11, 2020, and again upon reconsideration on October 20, 2020. (Tr. 107-108, 177-190.) Thereafter on November 25, 2020, Claimant filed a written request for hearing. (Tr. 194.) ALJ Brown held the administrative hearing by telephone on February 3, 2022. (Tr. 32-56.) On March 1, 2022, ALJ Brown entered an unfavorable decision. (Tr. 9-31.) Claimant then sought review of the ALJ's decision by the Appeals Council on March 15, 2022. (Tr. 6.) The

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 9.

Appeals Council denied Claimant's request for review on August 30, 2022, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1.) Claimant timely filed the instant action pursuant to 42 U.S.C. § 405(g) on October 28, 2022, seeking judicial review of the ALJ's decision. (ECF No. 2.) The Commissioner filed a transcript of the administrative proceedings on January 10, 2023. (ECF No. 9). Claimant subsequently filed his *Brief – Social Security* (ECF No. 12) on March 27, 2023, and the Commissioner filed his responsive *Brief in Support of Defendant's Decision* (ECF No. 13) on April 26, 2023. Claimant then filed her *Reply Brief* on May 10, 2023. (ECF No. 14.) As such, this matter is fully briefed and ripe for adjudication.

### B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes the relevant portions here for the convenience of the United States District Judge.

### 1. *Treatment Records*

By way of background, in 2019, prior to the relevant period, Claimant saw primary care physician Richard Cain, M.D., for routine appointments (Tr. 438, 443-44, 448). During appointments, Claimant complained of back pain with radicular symptoms into his right leg, generally rating his pain as a five out of ten on an ascending scale (Tr. 439, 444, 446, 448, 450). Claimant was sent for an MRI, which showed "minimal" degenerative changes without focal disc abnormality and without central or neural foraminal stenosis (Tr. 451-57). Dr. Cain prescribed Flexeril and Tramadol (Tr. 439, 447).

In December 2019, Claimant saw pain management physician Richard Bowman, M.D., for low back pain radiating into his right leg (Tr. 394, 396). However, Dr. Bowman

noted that "[t]here were no significant findings on the MRI which could explain [Claimant's] radicular symptoms," and his "EMG [was] normal" (Tr. 396; see also Tr. 425-27). Although Claimant had tenderness in the lumbar spine and a positive right facet loading test on examination, Claimant retained full (5/5) motor strength, negative straight leg raising tests, and intact reflexes (Tr. 396). Dr. Bowman recommended lumbar injections (Tr. 396-97).

In January and February 2020, while treating with primary care physician Dr. Cain for medication refills, a vaccine, and labs, Claimant reported back pain radiating into his right leg (Tr. 435, 437, 491, 494). Claimant also noted chest pain and shortness of breath when performing yardwork and household activities, but he indicated that cardiology felt his symptoms were "non- cardiac," and Claimant continued to smoke cigarettes (Tr. 438, 494-95). He rated his pain as a five out of ten on an ascending scale (Tr. 435, 491). On examinations, Claimant had tenderness and reduced range of motion in his lumbar spine, but he had intact muscle tone and strength, reflexes, and sensation throughout his extremities (Tr. 494). He ambulated "normally but [also displayed] some arthritic symptoms and limping" (Tr. 494). Dr. Cain noted that Dr. Bowman had recommend epidurals, but Claimant "decline[d]," and Dr. Cain refilled Claimant's muscle relaxer and pain medication (Tr. 435-36, 495).

Claimant saw Dr. Cain for routine follow ups in May and July 2020 (Tr. 484, 524). Claimant continued to report back and leg pain, and his physical examinations were unchanged (Tr. 487, 527-28). Dr. Cain refilled Flexeril, explaining to Claimant that he "did not have much to offer him," and that he would need to consider whether he wants to do the epidurals or see someone for a "second opinion" (Tr. 487-88). At Claimant's

request, Dr. Cain also supplied him with a letter indicating that he was treating Claimant for back pain with sciatica and that his pain prevented him from being able to work (Tr. 523).

In September 2020, Claimant appeared for a cardiology consultation with Scott Duffy, M.D., for his history of coronary artery disease (with stent placement in 2013) (Tr. 562, 564). Claimant denied any chest pain (Tr. 564). He reported some shortness of breath, which he attributed to smoking, and nevertheless, continued to smoke approximately a pack of cigarettes a day (Tr. 564). Dr. Duffy documented that Claimant's last stress test (from August 2019) was normal and his cardiac examination was unremarkable (Tr. 562). Dr. Duffy also noted that Claimant appeared to be comfortable and walked with a normal gait (Tr. 565). Dr. Duffy recommended smoking cessation and a routine follow up in six months (Tr. 566). At a follow up with Dr. Cain in October 2020, Claimant continued to report back and right leg pain as well as right hand and right knee pain (Tr. 553, 557). Claimant's physical examination was unchanged (Tr. 558). Dr. Cain ordered right hand and right knee x-rays (Tr. 559). Claimant's right wrist x-ray showed early degenerative changes with no acute osseous abnormality, and his right knee x-ray was unremarkable (Tr. 560). After Claimant inquired about a parking permit due to his back pain, Dr. Cain informed Claimant that he had not yet attempted physical therapy (Tr. 558). Dr. Cain advised Claimant that he could provide a temporary parking permit while he tried physical therapy (Tr. 558). Claimant declined, indicating that he would return to Dr. Bowman for further recommendation (Tr. 558).

In October 2020, Laura Cunnings, FNP, performed a consultative examination in connection with Claimant's disability claim (Tr. 546-48). Claimant reported arthritis in

his spine, ribs, and legs that caused mostly dull, but occasionally sharp, pain (Tr. 546). Claimant took Tramadol and Flexeril, and although his pain management physician recommended injections, he had not followed through with them (Tr. 546). On examination, Claimant had a positive straight leg raise in his right leg, but he walked with a normal gait. *Id.* Additionally, the Claimant was able to get onto and off of the examination table without difficulty; he was able to walk on his heels and his toes, perform tandem gait, and squat without difficulty; he had normal sensation and reflexes; and he had no muscle atrophy (Tr. 54-48).

In early 2021, Claimant treated for right knee pain and occasional knee locking and noted that he had undergone an arthroscopy eight years earlier (Tr. 760). Claimant had a positive McMurray test (indicating possible meniscus tear), but otherwise his examination was unremarkable (Tr. 760). An MRI of Claimant's right knee showed a coronally oriented tear at the anterior root attachment of the lateral meniscus with a tiny meniscal cyst (Tr. 676). However, after being tentatively planned for surgery, Claimant never attended the cardiac clearance (Tr. 614). Approximately a year later, in January 2022, Claimant saw primary care provider Ruth Full, PAC, to establish care (Tr. 613). Claimant did not report right knee pain, but instead complained of left knee pain that had begun approximately a month earlier (Tr. 613). Ms. Full ordered a left knee x-ray, which showed mild degenerative changes (Tr. 615, 620).

### 2. *Opinion Evidence*

State agency experts Amy Wirts, M.D., and Palle Reddy, M.D., reviewed the record in June and August 2020, respectively, and opined that Claimant was capable of lifting/carrying ten pounds frequently and twenty pounds occasionally,

standing/walking for six hours in an eight- hour workday, and sitting for six hours in an eight-hour workday, i.e., capabilities consistent with light work, with occasional postural activities (Tr. 84-86, 123-25).

### 3. Hearing Testimony

At the hearing, the ALJ employed a vocational expert ("VE") to aid his determination whether Claimant could perform his past relevant work or other work. The ALJ asked the VE to consider an individual of Claimant's age, education, and work experience who could perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), that involved frequent operating of foot controls bilaterally; frequent operating of hand controls with the right hand; frequent handling and fingering with the right hand; frequent balancing; occasional climbing ramps/stairs, stooping, kneeling, crouching, and crawling; no climbing ladders/ropes/scaffolds; occasional exposure to unprotected heights; and frequent working around moving mechanical parts, operating a motor vehicle, and working in extreme cold, in extreme heat, in atmospheric condition, and in vibration (Tr. 51). The ALJ asked if such an individual would be able to perform Claimant's past relevant work or other work available in the national economy (Tr. 52). In response, the vocational expert testified that Claimant could not perform his past relevant work, but he could perform other unskilled, light work in the national economy, such as an information clerk, routing clerk, and mail sorter. (Tr. 52).

### 4. Other Evidence

In the December 2019 "Function Report" completed by Claimant in the initial processing of the claim for benefits, he reported that he experiences chest pain and shortness of breath due to his heart disease. (Tr. 337.) He has numbness in his right foot

due to inflammation in his right lower spine. *Id*. He is unable to stand or sit for long periods at a time. *Id*. When he wakes up, he must sit on the bed for a few minutes "to get my legs working to walk." (Tr. 338.) He "do[es] very little chores" because of low back pain and his inability to stand for long periods. *Id*. He explained that he normally must take breaks to finish. *Id*. He must sit to put on his clothes and shoes. *Id*. He also has trouble getting out of the bathtub due to leg pain. *Id*. He can sometimes prepare his own meals, but he is unable to stand at the stove for long periods. (Tr. 339.) He is unable to do yard work due to back and leg pain. (Tr. 340.) He must use a grocery cart or cane when walking through the store. *Id*. He can only walk 30 feet before needing to stop and rest for 10-15 minutes. (Tr. 342.) He uses a cane on a daily basis. (Tr. 343.) He often stumbles due to leg pain and numbness in his right foot. (Tr. 344.) Additionally, Claimant indicated that he could walk 30 feet before resting but could lift up to 50 pounds; he performed personal care independently; he prepared simple meals; he performed household chores but was unable to do yardwork; shopped in stores once or twice a month; and he fished and watched television for recreation (Tr. 337-42).

In the subsequent August 2020 Function Report, which was completed at the reconsideration level, he reported continued back, leg, and chest pain. (Tr. 358.) He also reported a continued inability to stand or sit for long periods. *Id*. He explained that he "[t]ire[s] out quick." *Id*. He is unable to get comfortable due to pain in his lower back and legs. (Tr. 359.) He again reported that he must sit when dressing and putting on his shoes. *Id*. He must hold the shower wall when washing and drying off. *Id*. When he prepares a full meal, he sits at the table to relieve his back and leg pain. (Tr. 360.) He is unable to bend, reach, or stand without severe back pain. *Id*. He reported a continued

8

need to use a cart or cane to get through the grocery store. (Tr. 361.) His conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing. (Tr. 363.) He can walk about 100 yards before needing to stop and rest for 10-15 minutes. *Id.* He also described that he continues to use a cane daily. (Tr. 364.) Additionally, he indicated that he could walk 100 yards (approximately 300 feet) before resting; he performed his personal care; every two weeks he cleaned and washed laundry for half of a day; he went outside daily; and he shopped in stores once a month, using a cart or cane to navigate the store (Tr. 358-63). In both questionnaires, Claimant indicated that he could not drive long distances due to back and leg pain (Tr. 340, 361).

Claimant drove himself 37 miles to attend a February 2020 consultative examination in connection with his disability claim (Tr. 477). At the appointment, he reported that he woke around 4 to 6 a.m., beginning his day with coffee and a cigarette, showering, watching television, and attending any scheduled appointments (Tr. 481). In the afternoon, he took a nap, ate, watched television, and performed household chores (Tr. 481). He performed household chores, including yardwork on his riding mower, washing laundry, vacuuming, and preparing simple meals (Tr. 481). He regularly went outside, and for exercise, walked and did leg exercises (Tr. 480-81). He fished as a hobby (Tr. 481). He ate dinner around 6 p.m., watched more television, and spent time with family before going to sleep at 10 p.m. (Tr. 481).

Claimant testified that he has lower right back pain that is constant and radiates into his right leg. (Tr. 38.) It is hard for him to stoop and usually when he puts on his jeans and shoes, he must sit on his bed because he is unable to stand on one leg. (Tr. 39.) He uses a cane because there are times that he stumbles when walking. *Id.* He was

prescribed the cane and has been using it "[p]retty close to a year now." *Id.* He uses his cane "first thing every morning" and must sit on his bed to make sure his legs are ready to work. (Tr. 40.) He uses it when he goes to the grocery store. *Id.* He also normally uses it when he walks from the living room to the kitchen. (Tr. 41.) He can only stand 5-10 minutes in one place and is unable to walk "very far." *Id.* He can sit for about one hour but is moving constantly while sitting. (Tr. 42.) Due to his coronary artery disease, he experiences shortness of breath and fatigue. (Tr. 43.) He also explained that his back pain impacts his sleep and as a result, he lies down and takes a 2-hour nap most days. (Tr. 43-44.) He experiences shortness of breath when walking from the living room to the kitchen. (Tr. 44.) He experiences right knee pain and swelling "[p]retty much every day." (Tr. 45.) He lies on the couch and elevates his right leg during the day and elevates it at night when he goes to bed. *Id.*

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v.*

*Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step. At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the

11

fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ

must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ first found that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability on December 6, 2019. *Id.* At step two, the ALJ found that the following

impairments that he found were sufficiently "severe" as defined in 20 C.F.R. §§ 404.1520(c) and 416.920(c): coronary artery disease; hyperlipidemia; obesity; degenerative joint disease in Claimant's left knee, as well as his right hand; meniscus tear, cyst, and post-surgical changes in the right knee; and degenerative disc disease. (Tr. 14-15.) Following this list, the ALJ concluded without elaborating that these "medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28." (Tr. 15.)

The ALJ then formulated the residual functional capacity (RFC), finding that Claimant can perform "light work," as defined in the applicable regulations, but with the following limitations:

- *Frequently*, may operate foot and hand controls; handle, finger,[3] and feel with the right hand; work around environmental hazards such as moving mechanical parts, vibration, and extreme cold, heat, or atmospheric conditions; and operate a motor vehicle;
- *Occasionally*, may climb ramps and stairs, stoop, kneel, crouch, or crawl;
- *Never* may climb ladders, ropes, or scaffolds.

(Tr. 19.) At the fourth step, the ALJ found that Claimant could not perform his past relevant work (Tr. 24). At the fifth step, relying on the expertise of a vocational expert, the ALJ found that with this RFC Claimant was able to perform the representative light, unskilled jobs of an information clerk, routing clerk, and mail sorter (Tr. 24-25). Accordingly, the ALJ concluded that Claimant was not under a disability at any time from December 6, 2019, through the date of the ALJ's decision (Tr. 25-26).

---

[3] In the context of evaluating a claimant's work-related limitations or restrictions, "finger" is a term of art for a person's fine-manual dexterity of the hands and ability to feel the size, shape, temperature, or texture of an object by the fingertips. *See* Physical Limitations, Program Operations Manual System ("POMS"), at § 25020.005(A)(2) (Apr. 5, 2007).

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

The parties' central dispute is whether the ALJ evaluated Claimant's subjective symptoms pursuant to the two-part test set forth in 20 C.F.R. § 404.1529 by considering first the objective medical evidence, then the "*other evidence*," and "built an accurate and logical bridge" in his written decision between the RFC findings and the record evidence

as a whole.[4] *See* 20 C.F.R. § 404.1529(c); SSR 16-3p. *See also Arakas v. Soc. Sec.*, 983 F.3d 83 (4th Cir. 2020) (requiring the ALJ to build "an accurate and logical bridge" between the evidence and her findings).

Under the analytical framework set forth in § 1529, an ALJ must first determine whether the evidence demonstrates one or more medical impairments that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. § 104.1529(a)-(b); *Arakas*, 983 F.3d at 95. Claimant conceded that the ALJ followed this step appropriately when he found that Claimant's medical impairments could reasonably be expected to produce the alleged symptoms. (ECF No. 12 at 4 (citing Tr. 20).) However, Claimant argued that the ALJ did not properly follow the second step set forth in § 1529(c), which required him to assess whether Claimant's self-described limitations are consistent with, and supported by, "the record as a whole." (ECF No. 12 at 4 (citing 20 C.F.R. § 404.1529(c); *Arakas*, 983 F.3d at 95).) Claimant challenged ALJ Brown's analysis of the subjective complaints in determining Claimant's RFC. (ECF No. 12 at 4.) Claimant explained that the Fourth Circuit "has a long history of strictly interpreting and enforcing SSA's rules about the appropriate analysis of a claimant's subjective complaints as *not being an analysis which begins and ends with discussing the objective evidence.*" *Id.* (citing *Arakas*, 983 F.3d at 95) (emphasis added).

---

[4] As Claimant explained in her *Brief*, the "other evidence" listed in the applicable regulations includes statements from medical and non-medical sources, as well as "other factors" such as the Claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken; treatment, other than medication; work history; and any other factors concerning her functional limitations and restrictions due to pain or other symptoms. (*See* ECF No. 12 at 4 (citing 20 C.F.R. § 404.1529(c); SSR 16-3p).)

Claimant explained that the ALJ did not "reasonably or logically find" that Claimant's subjective complaints were inconsistent with the objective medical evidence. According to the Claimant, "the objective evidence demonstrates his medical history related to his degenerative disc disease and lower extremities, which only *supports* his very reasonable description of limitations." (ECF No. 12 at 9-10.) To illustrate this point, Claimant described specific medical records that allegedly conflicted with the ALJ's finding, but were ignored in the ALJ's written decision—with particular focus on evidence of Claimant's ability to sustain activities involving standing/walking for more than relatively short periods of time, followed by the need to rest due to pain as well as his need to use a cane when ambulating. *Id.* Claimant pointed to correspondence from Richard Cain, M.D., wherein Dr. Cain attributed the cause of Claimant's chronic back pain to sciatica. (Tr. 523.) Dr. Cain explained that he did not see improvement in Claimant's symptoms with medication. *Id.* Additionally, Claimant pointed to "numerous abnormal findings" observed during physical examinations, such as tenderness over the right lumbar paravertebral region, positive right facet loading, and dysesthesias on the right L5 nerve root; limping; musculoskeletal tenderness and limited range of motion, pain at about 80- 85° on the right side, and irregular gait due to pain; right supine straight leg raise positive for right-sided low back pain; and very tender along the medial joint line. (ECF No. 396; 439; 446-447; 451-455; 494-495; 527; 548; 558; 572-576.)

Next, Claimant argued that "the ALJ's RFC is hopelessly defective and unamenable to judicial review for the same reasons identified in *Dowling v. Comm'r of SSA*, 986 F.3d 377 (4th Cir. 2021)." (ECF No. 12 at 10.) Claimant explained that in *Dowling*, the ALJ did not assess the appellant's RFC using the framework set forth in § 404.1545 and SSR 96-

8p, other than once in the boilerplate section of the decision prior to the actual RFC analysis. *Id.* The ALJ also "did not indicate that his RFC assessment was rooted in a function-by-function analysis of how Appellant's impairments impacted her ability to work." *Id.* The Fourth Circuit noted that "an RFC assessment is a separate and distinct inquiry from a symptom evaluation, and the ALJ erred by treating them as one and the same." *Id.* The Fourth Circuit found in *Dowling* that the ALJ's failure to follow the regulatory framework set forth in § 1545 and SSR 96-8p, "weighed heavily in favor of remand." (ECF No. 12 at 10 (citing *Dowling*, 986 F.3d at 387).) According to the Claimant, ALJ Brown, like the ALJ in *Dowling*, only referred to those regulations "in the boilerplate introductory section" of his decision, and that remand is required "[f]or this reason alone." *Id.*

In response to Claimant's challenges to ALJ Brown's written analysis, the Commissioner argued that an ALJ is not constrained to accept a claimant's unsupported subjective allegations about his limitations, so long as the ALJ's rationale is reasonably discernable and supported by substantial evidence. According to the Commissioner, ALJ Brown adequately explained that the alleged intensity, persistence, and limiting effects of Claimant's symptoms were inconsistent with the broader record—and, in doing so, properly considered the relevant regulatory factors and provided substantial evidence to support his fact-finding. (ECF No. 13 at 10.) The Commissioner then summarized the subjective evidence expressly discussed in the ALJ's decision and appropriately explained why he found that the subjective evidence was inconsistent with the overall evidence of record. *Id.* at 14.

The Commissioner's argument is well-taken. Indisputably, an ALJ's findings about a claimant's self-described limitations, like all findings, must be reasonably connected to  the evidence of record, and the ALJ must build "an accurate and logical bridge" between the evidence and his findings in his written decision—but that is precisely what the ALJ did in this matter. ALJ Brown's detailed decision provided the Court an adequate opportunity to trace his reasoning, and he tethered the evidence of record to his RFC findings. Also indisputable is Claimant's entitlement to rely upon his subjective complaints exclusively to demonstrate his alleged symptoms prevent him from working; however, this does not mean that the ALJ must accept Claimant's statements to the exclusion of the objective or other evidence of record–especially when there are inconsistencies with the overall record of evidence. *See* 20 C.F.R. § 404.1529(4). In fact, the ALJ is expressly *obligated* to consider whether the Claimant's alleged functional limitations "can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

The ALJ properly applied the two-step analysis set forth in and relied on the regulatory factors in 20 C.F.R. § 404.1529 and 416.929 relevant to the evidentiary determination of the nature, intensity, frequency, or severity of Claimant's symptoms and their impact on his ability to work (Tr. 19-24). The ALJ explained that after considering all of the evidence, he found that Claimant's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely *consistent with* the objective medical evidence (Tr. 19-24).  The ALJ expressly acknowledged that he could not disregard Claimant's statements about his symptoms solely due to lack of objective evidence (Tr. 19 (explaining that "whenever statements about the intensity, persistence,

or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work related activities")).

Nor did the ALJ "improperly increase" the Claimant's burden of proof through requiring Claimant's self-reported symptoms to be supported by objective medical evidence. (*See* ECF No. 12 at 15.) At the first step of the two-part framework set forth in 20 C.F.R. § 104.1529(a)-(c), the ALJ's evaluation appropriately considered *both* the objective medical evidence, *as well as Claimant's treatment history* (Tr. 19-24). *See* 20 C.F.R. § 404.1545(a)-(b); SSR 16-3p, 2017 WL 5180304, at *5, 7–8 (stating that medical evidence and treatment history are two factors for the ALJ to consider when evaluating subjective allegations). With regard to Claimant's back impairment, the ALJ acknowledged Claimant's positive examination findings, such as lumbar spine tenderness with limited range of motion and irregular gait at times (Tr. 21, 396, 494, 547-48, 565, 558). However, the ALJ explained that Claimant nevertheless retained full motor strength and intact sensation and reflexes (Tr. 21, 396, 494, 547-48, 565, 558). Claimant's MRI showed only "minimal" degenerative changes and no evidence of nerve impingement, and his EMG was normal (Tr. 396, 425-27, 457). Moreover, Claimant's treating providers recorded that Claimant did not undergo recommended treatment measures, such as epidural injections and physical therapy (Tr. 20, 487-88, 495, 546, 558). Similarly, Claimant did not follow through with recommended meniscus repair surgery for his right knee, and thereafter, a year later only complained about his left (not right) knee (Tr. 22, 614).

With regard to Claimant's history of coronary artery disease, the ALJ discussed Claimant's inconsistent complaints at appointments.  For instance, although Claimant reported chest pain on exertion at appointments with his primary care physician, Dr. Cain, Claimant indicated that cardiology had determined that his pain was non-cardiac related (Tr. 20, 438, 494-95).  But, when Claimant appeared for a cardiology follow up, Claimant denied any chest pain, and reported shortness of breath, which he attributed to smoking cigarettes (Tr. 20, 564-65). Cardiologist Dr. Duffy recommended smoking cessation but, nevertheless, Claimant continued to smoke frequently (Tr. 20, 566, 614).  Claimant also explicitly denied chest pain and shortness of breath at the consultative examination with FNP Cunnings (Tr. 20, 547). As the ALJ's analysis of the evidence demonstrates, the ALJ consideration did not end at the objective medical evidence (Tr. 19-24).  He reviewed Claimant's treatment history and considered the extent of Claimant's treatment and his failure to follow through with recommended treatment (Tr. 20-22).  *See* SSR 16-3p, 2017 WL 5180304, at *9 (explaining an ALJ may find the intensity and persistence of alleged symptoms are inconsistent with the overall evidence of record "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms").  The ALJ also found that Claimant "functions fairly well" considering Claimant's activities of daily living. (Tr. 22).  For instance, the ALJ noted that he performed personal care independently; he did household chores, such as preparing simple meals, washing laundry, and vacuuming; he mowed his lawn with a riding mover; he shopped in stores; he walked for exercise; and he fished as a hobby (Tr. 22, 480-81).

Claimant challenges that in evaluating these daily activities, the ALJ relied selectively on notes from a consultative examination, while ignoring the examiner's indication in the same notes that Claimant reported he "can only stand for up to 20 minutes at a time due to pain." (ECF No. 12 at 11 (citing Tr. 480-481).) Claimant further pointed to other evidence that he "do[es] very little chores" because of low back pain and an inability to stand for long periods, which normally required him to take breaks in order to complete a task; that he has trouble getting out of the bathtub due to leg pain, and must hold the shower wall when washing and drying off; that he can sometimes prepare his own meals, but is unable to stand at the stove for long periods; that he is unable to do yard work due to back and leg pain; that he only goes shopping once or twice per month, and must use a grocery cart or cane when walking through the store; He is unable to do yard work due to back and leg pain; and he stated in his August 2020 Function Report that he is no longer able to engage in his hobby of fishing. (Tr. 39, 40; 338-340, 359-362.) According to Claimant, the ALJ failed to appreciate that, under SSR 96-8p, he must consider the difference between a claimant's being able to engage in *sporadic* physical activities, and being able to work an entire eight-hour day for five consecutive days in a week. Likewise, he must consider not only the type of activities the claimant can perform but also the extent to which the type of activity can be formed. (ECF No. 12 at 12.) In addition to evidence of Claimant's daily activities, Claimant argued that the ALJ selectively cited or ignored evidence concerning Claimant's knee and leg symptoms, medication and treatment, and work history. *Id.* at 13-14.

Claimant took issue with the ALJ's written evaluation of "other evidence" at the second step of the regulatory framework under 20 C.F.R. § 1545(c), such as the evidence

of daily activities. According to Claimant, such evidence "prove[s] only that he can perform sporadic activities, and it is well settled that the ability to perform sporadic daily activities is not inconsistent with claiming disability." (ECF No. 12 at 12 (citations omitted).) While the ALJ's decision did not specifically discuss every single piece of evidence that could support a different inference, the ALJ is not *required* to do so.

The Court further recognizes that See *Manigo v. Colvin*, 2015 WL 74954, at *5 (D.S.C. Jan. 6, 2015) (explaining that "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered") (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Indeed, "there is no particular language or format that an ALJ must use in his . . . analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review." *Clark v. Comm'r of Soc. Sec.*, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). The ALJ's opinion is sufficient if it "not only sets forth the facts used in rendering his decision, but it also provides a thorough examination of the medical evidence." *Id.* Likewise, the U.S. District Courts within the Fourth Circuit have consistently found that an ALJ "labor[s] under no requirement to fashion an RFC that exactly matched [the claimant's] testimony or the opinion evidence." *Gilmore v. Kijakazi*, 2022 WL 2869047, at *8 (M.D.N.C. Jul. 21, 2022), adopted, 2022 WL 3446133 (Aug. 17, 2022).

ALJ Brown's decision did not misrepresent or fail to consider Claimant's self-reported symptoms. Nor was the decision solely reliant on the objective medical evidence; the ALJ clearly considered "other evidence of record," and weighed it against the record

as a whole for consistency and supportability.[5] Claimant attempted to show that, like the circumstances in *Arakas*, ALJ Brown's analysis misrepresented Claimant's daily activities and selectively relied on certain evidence at the exclusion of the overall record. On review, however, the undersigned disagrees with Claimant's characterization of the ALJ's analysis as inaccurate and selective. To the contrary, ALJ Brown's written decision demonstrates careful consideration of the evidence, reasonable and supportable choices, and an explanation of the trail of logical reasoning the ALJ employed in reaching his conclusions based upon the evidence.

The ALJ in this matter did not mischaracterize Claimant's activities of daily living or use them to establish that he could work (Pl.'s Br. at 11-12). Rather, the ALJ considered Claimant's daily activities as a factor, among many, in assessing Claimant's subjective statements. *See* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). The ALJ fairly depicted those activities as they appeared in the record and also discussed Claimant's claim that he could only stand for 5 to 10 minutes at a time (Tr. 20; *compare* Tr. 22, *with* Tr. 480-81). To the extent Claimant claims that the ALJ erred by pointing to various activities he performed documented within the record while ignoring other statements he made about his activities in connection with his disability claim, Claimant is incorrect. There were numerous inconsistencies between Claimant's reported activities

---

[5] For the same reason, the undersigned **FINDS** that Claimant's reliance upon the opinion in *Dowling*, 986 F.3d at 387, is inapposite. According to the Claimant, ALJ Brown, like the ALJ in Dowling, erred because he only cited to the regulatory framework set forth in § 1545 and SSR 96-8p, "in the boilerplate introductory section" of his decision. (ECF No. 12 at 10 (citing Dowling, 986 F.3d at 387).) Certainly, ALJ Brown specifically cited to the two-part framework set forth in § 1545 and SSR 96-8p early in the written decision. Unlike the ALJ in *Dowling*, however, ALJ Brown obviously carried his analysis through the subsequent steps in the sequential evaluation process, and explained how the record as a whole supported his findings. (*See* ECF No. 13 at 10 n.3.)

of daily living, which undermined Claimant's subjective claims rather than bolstered them (*compare* Tr. 337-42, 358-63, *with* Tr. 480-81).

Second, the ALJ considered the location, duration, frequency, and intensity of Claimant's pain and the precipitating and aggravating factors that he alleged (Pl.'s Br. at 13). The ALJ devoted a full paragraph to addressing Claimant's description of his pain (Tr. 20).    However,  after considering the relevant factors to the subjective complaints analysis, the ALJ reasonably found Claimant's statements did not align with the broader record (Tr. 20-24).

Third, Claimant argues the ALJ "selectively avoid[ed]" discussion of Claimant's medication, treatment, and other measures, including "their meaning" (Pl.'s Br. at 13). Not so. As outlined above, the ALJ explicitly discussed Claimant's treatment history, the extent and nature of Claimant's treatment, and his failure to utilize recommended treatment measures, which undermined his subjective complaints (Tr. 20-22). For instance, the ALJ noted Claimant took pain medication and that even though spinal injections were recommended on several occasions, Claimant declined (Tr. 20-21, 487-88, 495). Claimant's treating physician Dr. Cain also highlighted that Claimant had not tried physical therapy (Tr. 558). He also failed to follow through with surgery on his right knee (Tr. 21-22, 614). Further, the ALJ discussed Claimant's claim that he used a cane, but the ALJ explained that the "overall physical examinations and imaging did not support" that he medically required a cane given that there was no documentation that a medical source prescribed it or indicated that a cane was necessary, and Claimant regularly appeared at appointments throughout the record without one (Tr. 22).

Fourth and finally, to the extent that the ALJ did not expressly discuss Claimant's "impeccable" work history, it is only a single factor that an ALJ considers and is by no means dispositive (Pl.'s Br. at 13-14). *See* 20 C.F.R. §§ 404.1529(c), 416.929(c) (listing factors relevant to evaluating Claimant's subjective allegations). *See also*, *e.g.*, *Cramer v. Colvin*, No. 3:13-cv-00414, 2014 WL 1365911, at *6 (W.D.N.C. Apr. 7, 2014) ("The Court of Appeals for the Fourth Circuit has not adopted this heightened credibility standard, and this court as well as the United States Court for the Southern District of West Virginia have flatly rejected giving special favor to claimants who have been fortunate enough to have a successful work history."); *Holmes v. Berryhill*, No. 2:16-cv-00844, 2017 WL 3279016, at *6 (D.S.C. July 17, 2017) ("[F]ailure to mention a lengthy work history – standing alone – is not reversible error."), *report and recommendation adopted*, 2017 WL 3263889, at *1 (D.S.C. Aug. 1, 2017). Here, the ALJ agreed that Claimant was unable to return to his prior physically demanding career as a machine operator, i.e., heavy work, although he could perform significantly less demanding work available in significant numbers in the national economy meeting his specific work requirements.

The ALJ here was faced with conflicting inferences and had the "unenviable task" of choosing between the alternatives. *McCall v. Apfel*, 47 F. Supp. 2d 723, 731 (S.D. W. Va. 1999). The discussion *supra* demonstrates that the ALJ did not improperly "cherry-pick" only the evidence from the record to support a finding of non-disability; to the contrary, it is readily apparent that ALJ Brown *did* consider the "other" evidence, and appropriately weighed this evidence for supportability and consistency. Mere disagreement with the inferences the ALJ made from the evidence is insufficient, standing alone, to demonstrate error. By simply pointing to other evidence on the record that could

support a different finding, Claimant is essentially asking the Court to *re-weigh* the evidence. This is improper; as set forth *supra*, the Court's only role on review pursuant to 42 U.S.C. § 405(g) is to ensure the ALJ's decision is supported by substantial evidence, and free of legal error. The ALJ appropriately considered Claimant's subjective complaints under the appropriate regulatory framework, and substantial evidence—more than a scintilla of evidence—supports the ALJ's fact-finding. While Claimant, and even the Court, may have reached a different determination, ALJ Brown's decision plainly met this standard. Thus, the undersigned **FINDS** that the ALJ's analysis of Claimant's RFC is supported by substantial evidence, and Claimant has not demonstrated reversible error. Accordingly, the undersigned respectfully recommends that Claimant's request for remand be denied.

### IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 12), **GRANT** the Commissioner's request to affirm his decision (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the

Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Copenhaver.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER:    February 28, 2024

Dwane L. Tinsley
United States Magistrate Judge